IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| HOPE L. SNYDER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 1:11-CV-077 |
| ) | |
| D. ANNE LIVINGSTON; ) | |
| EAR, NOSE & THROAT ASSOCIATES, ) | |
| PC. ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

Defendants, D. Anne Livingston ("Livingston") and Ear, Nose & Throat Associates, PC ("ENT") submit they are entitled to summary judgment against the plaintiffs, Hope L. Snyder ("Snyder") for several reasons.  First, ENT is entitled to summary judgment on Snyder's "regarded as disabled" claim under the Americans With Disabilities Act ("ADA") because, even if defendant, Anne Livinsgston ("Livingston"), told physicians and/or staff at  ENT that Snyder was "mentally unstable,"  which Livingston denies, such statement falls far short of establishing a prima facie "regarded as disabled" claim under the ADA.  Second, assuming a hostile work environment claim is cognizable under the ADA, the conduct of which Snyder complains was neither severe nor pervasive, did not interfere with Snyder's work performance, and was not "hellish."  Third, ENT is entitled to summary judgment on

Snyder's retaliation claim because no materially adverse employment actions were taken against Snyder as a result of making complaints about Livingston's alleged comments or filing her first Charge of Discrimination.  Fourth, to the extent Snyder is attempting to pursue a hostile work environment/constructive discharge claim, her work conditions did not rise to the level of egregiousness necessary to satisfy the stringent standards applicable to a constructive discharge claim.  Fifth, Livingston is entitled to summary judgment on Snyder's state law defamation claim because, even if Livingston said that Snyder was emotionally unstable, such statement is an expression of opinion, not an actionable defamatory statement of fact.

## II.  STATEMENT OF FACTS

Snyder began working at ENT as a Hearing Aid Dispenser in February, 2006, and held that position until May, 2008.  (Dep. of Snyder at pp. 27-28).  In May, 2008, Snyder became the Office Manager, a position which she held until September, 2009.  Snyder was the Director of Administration for ENT from September, 2009 until April, 2010.  (Dep. of Snyder at pp. 27-28).

Livingston began her employment with ENT on November 19, 2007, as a Staff Audiologist.  When Livingston started with ENT, Snyder was an administrative assistant, as well as a licensed hearing instrument dispenser.  (Affidavit of Livingston at ¶2).  Livingston has no mental health training.  (Affidavit of Livingston at ¶2).

From February, 2008 until March, 2010, Snyder considered Livingston a close friend and the women socialized outside of work.  (Dep. of Snyder at p. 28).  At some point Snyder recalls informing Livingston that she was on anti-depressant medication.

The women may have also discussed Snyder's post-partum depression. (Dep. of Snyder at pp. 120-122). Livingston recalls that Snyder spoke openly with her about having attention deficit disorder ("ADD"). Snyder discussed her ADD with Livingston and co-workers. (Affidavit of Livingston at ¶3).

Although Livingston was aware of Snyder's ADD, she never treated Snyder any differently. At no time did Livingston ever perceive Snyder as being disabled, or unable to perform any of her work-related duties because she had ADD or any other physical, emotional or mental problem. (Affidavit of Livingston at ¶4).

On Friday, March 12, 2010, Snyder returned from a family trip to Las Vegas and had a conversation with Livingston. Snyder was in tears when she spoke with Livingston. Snyder indicated that she disliked everyone in the Chapel Ridge office of ENT and that she wanted to work at the Apple Glen location because she had friends working at that location. Livingston suggested that Snyder think about everything over the weekend and that the two of them would have further discussions about the matter the following week. (Affidavit of Livingston at ¶5).

On March 16, 2010, Snyder and Livingston had a telephone conversation. During the telephone conversation, Livingston stated that Snyder appeared to be on a bit of an emotional roller coaster and that no one knew how to act around Snyder. (Affidavit of Livingston at ¶6). Snyder claims that during the telephone conversation Livingston stated that Snyder was emotionally unstable. (Dep. of Snyder at p. 15). For her part, Livingston has no recollection of ever stating that Snyder was emotionally

3

unstable. Rather, she stated that Snyder appeared to be on a bit of an emotional roller coaster. (Affidavit of Livingston at ¶6). Snyder and Livingston yelled at each other during the telephone conversation on March 16, 2010. (Affidavit of Livingston at ¶6).

Snyder claims that Livingston also told an ENT physician, Dr. Rao, that she was emotionally unstable, and also may have made similar comments to ENT's employees. (Dep. of Snyder at pp. 20-23).

Livingston denies telling Dr. Rao, or anyone else at ENT, that Snyder was mentally unstable. Livingston may have repeated her comment about Snyder being on an emotional roller coaster, but she never used the phrase "mentally unstable" with anyone in any discussions about Snyder. (Affidavit of Livingston at ¶7).

Snyder claims that after her conversation with Livingston on March 16, 2010, she was called into a meeting with the CEO of ENT, Steve Sandquist ("CEO Sandquist"), as well as Dr. Rao and Dr. Kaiser. According to Snyder, she was allegedly demoted during the meeting. (Dep. of Snyder at pp. 16-17). Snyder claims that she was told that her job duties would be severely restricted.

In the Spring of 2010, Michael Disher, M.D. ("Dr. Disher") was the physician responsible for The Hearing Center. On May 10, 2010, ENT formally removed Dr. Disher from his responsibilities and restructured job responsibilities and duties of the physicians and personnel staffing The Hearing Center. CEO Sandquist is aware of Snyder's allegation that she was demoted during a meeting with him, Dr. Rao and Dr. Kaiser. Snyder was not demoted. Rather, there was simply a reorganization of job

4

responsibilities and duties. There was no change to Snyder's job responsibilities or duties nor was there any change to her compensation or benefits. (Affidavit of Steve Sandquist at ¶6).

Although Snyder claims that she was demoted, she admits that there was no change to her work schedule, pay, or benefits. (Dep. of Snyder at pp. 23-24). Snyder concedes that when her job duties were allegedly changed, no mention was made of her physical or mental state. (Dep. of Snyder at pp. 24-25).

On May 28, 2010, Snyder prepared a letter to Livingston resigning her position with The Hearing Center and indicating that she was taking a new position with The Balance Center. The letter reads as follows:

> The purpose of this letter is to announce my resignation from The Hearing Center effective two weeks from this date. This was not an easy decision to make. The past several years have been very rewarding for me personally. I've enjoyed working for The Hearing Center and take tremendous pride in what we've been able to accomplish. I have accepted a position with The Balance Center.
>
> I wish you and the company the very best. Please let me know what I can do to make this transition easier. (Dep. of Snyder, Defendant's Exhibit D).

Also on May 28, 2010, Snyder sent an email to various individuals, including CEO Sandquist, about her decision to resign from The Hearing Center. The email reads as follows:

> Leadership Group:
>
> I have put in the courier box for each of you my letter of resignation from The Hearing Center. My last day with The Hearing Center will be June 11th, 2010 with the exception of any previous agreed upon days with Tom. I have enjoyed working at The Hearing Center. I will provide any

information you need from me.  I have given Anne a list of my duties and have asked her who she would like trained on what aspects.  If you need any additional information from me, please do not hesitate to ask.  (Dep. of Snyder, Exhibit C).

Snyder filed a Charge of Discrimination against ENT on August 11, 2010.  She alleged discrimination based upon disability (Snyder deposition, Defendant's Exhibit B).  Snyder does not contend that she is disabled under the ADA.  Rather her claim is that ENT perceived her as being disabled, specifically a perception that she had a mental disability.  (Dep. of Snyder at pp. 72-73).  Snyder asserts that Livingston, CEO Sandquist, and Dr. Rao all perceived her as being disabled as a result of Livingston's purported comment about Snyder being emotionally unstable.  (Dep. of Snyder at p. 73).

Snyder filed a Second Charge of Discrimination on November 18, 2010.  She asserts disability discrimination as well as retaliation.

Snyder worked at The Balance Center as a Balance Technician from June 14, 2010, until June 10, 2011, when she voluntarily terminated her employment relationship with ENT.  On May 13, 2011, Snyder wrote a letter to Tom Boismier, Director of The Balance Center, in which she submitted her resignation effective June 10, 2011.  Snyder's letter to Boismier reads as follows:

> With this letter, I hereby submit my resignation from ENT Associates, P.C. effective Friday, June 10, 2011.
>
> At your convenience, I will be glad to discuss the reassignment of my work to others.
>
> I wish you good luck and continued success.   (Dep. of Snyder, Exhibit E).

6

Snyder believes that she was constructively discharged from ENT on June 10, 2011. She claims that she had no other choice but to quit her job because she was working in an unhealthy work environment. (Dep. of Snyder at p. 138).

Snyder filed a Complaint against Livingston and ENT on February 28, 2011. She alleged that ENT perceived her as being disabled, in violation of the ADA. (Doc. 1 at ¶5). She also claims that she was harassed and effectively demoted because she was allegedly mentally unstable. (Doc. 1 at ¶9). In addition Snyder also asserts a retaliation claim as well as a hostile work environment claim under the ADA. (Doc. 1 at ¶10). Finally, Snyder asserts a state law defamation claim against Livingston. (Doc. 1 at ¶8).

### III. ARGUMENT

#### A. ENT Did Not Regard Snyder As Disabled

The ADA prohibits employers from discriminating against a qualified individual because of his or her disability. 42 U.S.C. §12112(a). Specifically, the ADA provides "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* There are three ways to be considered disabled under the ADA: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102(1). Under the 2008 amendments to the ADA, effective January 1, 2009, to establish a "regarded as disabled"

7

claim, Snyder must demonstrate that she "has been subjected to an action prohibited under this [Act] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. §12102(3)(A).

To establish a prima facie claim of discrimination based upon disability, Snyder must demonstrate that: (1) she was disabled under the ADA; (2) her work performance met ENT's legitimate expectations; (3) adverse employment action was taken against her; and (4) similarly situated employees without a disability received more favorable treatment. *Mobley v. Allstate Ins. Co.,* 531 F.3d 539, 548 (7th Cir. 2008), *reh'g en banc denied.* Once Snyder establishes a prima facie case, then the burden shifts to ENT to provide a legitimate, nondiscriminatory reason for any adverse action taken against Snyder. *Barricks v. Eli Lilly and Co.,* 481 F.3d 556, 559 (7th Cir. 2007). However, if Snyder fails to establish her prima facie case, the burden does not shift, and ENT is entitled to summary judgment. *Mobley,* 531 F.3d at 548, *Winsley v. Cook County,* 563 F.3d 598, 604 (7th Cir. 2009).

Even taking as true Snyder's allegation that Livingston told others that Snyder was "mentally unstable," such comment is insufficient as a matter of law to establish that Livingston, or anyone else at ENT, regarded or perceived Snyder as disabled. In *Roberts v. Dimension Aviation,* 319 F.Supp.2d 985 (D.Ariz. 2004), Roberts claimed that co-workers called him stupid and retarded and also referred to him as "Dell," short for deliverance. In addition, one of Roberts' supervisors drew a picture of Roberts playing

8

domino's, with stars flying around his head, indicating that Roberts was confused, with a caption on the picture stating "It was my partner's fault." One of Roberts' ADA claims was that he was perceived as being disabled because of the name calling and the drawing. The District Court rejected Roberts regarded as disabled claim, concluding that the use of insulting terms by co-workers was insufficient to establish that Roberts was regarded as disabled, as was required to establish his prima facie case:

> Plaintiff claims that his co-workers referred to him as Dell, short for deliverance, called him stupid, retarded and fag. Plaintiff also claims that he was called walleye in one eye, in reference to his strabismus, or lazy eye. These insults were insufficient to establish that plaintiff was regarded as disabled. 319 F.Supp.2d at 990.

In *Tockes v. Air-Land Transport Services, Inc.*, 343 F.3d 895 (7th Cir. 2003), 540 U.S. 1179 (cert. denied 2004). Tockes was employed as a truck driver for the defendant. He previously injured his right hand while serving in the military, an injury which prevented him from performing work that required two hands, such as driving the truck that had not been adapted for a disabled person. The employer hired Tockes as a flatbed truck driver, despite being informed of the injury. Tockas was eventually fired after the employer discovered that he only used one hand in fastening a load to the bed of the truck, in violation of the company's safety rules. Tockes argued that co-workers called him crippled, disabled, and handicapped, and therefore perceived him as being disabled. The Seventh Circuit Court of Appeals rejected this argument:

> It is true that if Tockes is believed, the defendant called him "crippled" and "disabled" and "handicapped," but all are words with a range of meanings, and do not without more connote a belief that the individual is under the protection of the ADA. …To be disabled [within the meaning of the ADA], Tockes would have been unable to drive without some

9

accommodation to his disability. Unless the employer mistakenly believes that an employee has a disability grave enough to be so classified under the ADA, the employer's acting on the mistaken belief does not violate the statute. 343 F.3d at 896.

In *Costello v. Mutual Public School District 79,* 266 F.3d 916 (8th Cir. 2001), *reh'g en banc denied,* the plaintiff, a high school student, testified during her deposition that her band teacher called her retarded, stupid, and dumb on a daily basis. The plaintiff also alleged that the band director told her she could not longer play in the band because "she was too stupid and that he did have to teach students like that and then he would not." Costello argued that she was perceived as disabled. In rejecting Costello's argument, the Eighth Circuit Court of Appeals held that the name calling by the band teacher was "insufficient to raise a genuine issue of material fact on the matter," as to whether Costello was regarded as disabled. 266 F.3d at 924. *See also, Watson v. City of Miami Beach,* 177 F.3d 932, 935 (11th Cir. 1999) (evidence that other officers regarded plaintiff as "paranoid," "disgruntled," "oppositional," "difficult to interact with," and "unusual," is insufficient to raise a question of fact concerning whether plaintiff was regarded as disabled); *Scott v. Napolitano,* 717 F.Supp.2d 1071, 1087-88 (S.D.Cal. 2010) (regional director's statement that he heard employee was referred to as a "crazy man" and "nuts" was insufficient to establish that decisionmakers perceived plaintiff as disabled); *Gordon v. MCG Health, Inc.,* 301 F.Supp.2d 1333, 1341-1343 (S.D.Ga. 2003) (finding that defendant's reference to plaintiff as a "liability" was not evidence that defendant regarded plaintiff as substantially limited in working because "liability" was subject to many reasonable interpretations and not evidence that defendant regarded

plaintiff as unable to perform a class or broad range of jobs); *Crawford v. AT&T,* 177 F.Supp.2d 1293, 1300 (N.D.Ga. 2000) (defendant referring to plaintiff as "crazy" did not in any way address plaintiff's ability to work due to an impairment).

Similarly here, even if Livingston actually stated that Snyder was mentally unstable, such statements cannot, as a matter of law, give rise to a regarded as disabled claim under the ADA. Snyder cannot satisfy the first element of a prima facie case and therefore her claim must fail. Snyder cannot state a regarded as disabled claim under the ADA and ENT is therefore entitled to summary judgment on this claim.

### B. Snyder's ADA Hostile Work Environment Claim Must Fail

Snyder appears to raise a hostile work environment claim based upon her perceived disability. The Seventh Circuit Court of Appeals has not decided whether a claim for hostile work environment is cognizable under the ADA, but has assumed the existence of such a claim where resolution of the issues has not been necessary. *Mannie v. Potter,* 394 F.3d 977, 982 (7th Cir. 2005); *Conley v. Village of Bedford Park,* 215 F.3d 703, 712-13 (7th Cir. 2000). The Seventh Circuit has further assumed that the standards for proving a hostile work environment claim under the ADA would mirror those standards established for a hostile work environment claim under Title VII. *Mannie,* 394 F.3d at 982.

For harassment to approach the level of a hostile work environment, the harassment must be "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Conley,* 215 F.3d at 713. Whether a work environment is "hostile" or "abusive" depends upon "the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993). "The work place that is actionable is one that is 'hellish.'" *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir. 1997).

Here, even assuming Snyder may pursue a hostile work environment claim under the ADA, the claim must fail as a matter of law. The evidence is that Snyder was able to perform her work. There is no evidence to the contrary. The alleged conduct was neither severe nor pervasive and cannot be characterized as hellish or abusive. As a result, ENT is entitled to summary judgment on Snyder's hostile work environment claim, to the extent that such claim is cognizable under the ADA.

### C. ENT Is Entitled To Summary Judgment On Snyder's Retaliation Claim

There are two distinct ways for an employee to survive summary judgment on a retaliation claim. The plaintiff may present direct evidence of retaliation, or may proceed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *Metzger v. Illinois State Police,* 519 F.3d 677, 681 (7th Cir. 2008). Under the direct method, Snyder must present evidence of (1) a statutorily protected activity; (2) an adverse employment action taken by ENT; and (3) a causal connection between the two. *Moser v. Ind. Dept. of Corrections,* 406 F.3d 895, 903 (7th Cir. 2007); *Stone v. City of Indianapolis Public Utilities Division,* 281 F.3d 640, 644 (7th Cir. 2002), *cert. denied,* 537 U.S. 879 (2002). Direct evidence usually takes the form of an acknowledgement of discriminatory intent by the employer. *Fyfe v. City of Fort Wayne,*

12

241 F.3d 597, 601 (7th Cir. 2001). This type of evidence is exemplified by a statement such as "I fired you because of your disability." *Robin v. Espo Engineering Corp.,* 200 F.3d 1081, 1088 (7th Cir. 2000). Because direct evidence "essentially requires an admission by the employer," such evidence "is rare." *Benders v. Bellows & Bellows,* 515 F.2d 757, 764 (7th Cir. 2008). Snyder has no such evidence here and must therefore rely upon the indirect method of proof.

Under the indirect method of proof, based upon the burden-shifting analysis in *McDonnell Douglas,* Snyder must show that (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) a similarly situated employee who did not complain was treated more favorably. *Roney v. Illinois Department of Transportation,* 474 F.3d 455, 459 (7th Cir. 2007); *Haywood v. Lucent Technologies, Inc.,* 323 F.3d 524, 531 (7th Cir. 2003); *Stone,* 281 F.3d at 644. Failure to satisfy any one element of the prima facie face is fatal to the retaliation claim. *Roney,* 474 F.3d at 459.

An employee must establish some adverse employment action, defined as "a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Stockett v. Muncie, Indiana Transit System,* 221 F.3d 997, 1001 (7th Cir. 2000), *reh's denied*; *Krause v. City of LaCrosse,* 246 F.3d 995, 1001 (7th Cir. 2001); *Rabinovitz v. Pena,* 89 F.3d 482, 488 (7th Cir. 1996). An adverse employment action is a "quantitative or qualitative change in the terms or conditions of employment." *Roney,* 474 F.3d at 479. The overriding emphasis

is that the action must have a materially adverse effect on the conditions of employment. *Haugerud v. Amery School Dist.*, 259 F.3d 678, 691-92 (7th Cir. 2001).

"Typically, adverse employment actions are economic injuries." *Markel v. Board of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002). While an adverse employment action need not be quantifiable in terms of pay or benefits, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 2002). Otherwise, minor and even trivial employment actions that "an irritable, chip-on-the-shoulder employer did not like would form the basis of a discrimination suit." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996), *reh's en banc denied*.

Here, by Snyder's own admission, she did not suffer a materially adverse employment action as a result of allegedly making a complaint about Livingston's comments, or filing her first Charge of Discrimination. She was not terminated, demoted, denied a promotion, nor did she sustain a decrease in pay or benefits. The only conceivable "action" against Snyder was a reorganization of the department and changes in her job responsibilities, which, as a matter of law, are not materially adverse employment actions. Moreover, Snyder herself severed her employment relationship with both The Hearing Center and The Balance Center. ENT took no actions against her.

Snyder cannot satisfy the third prong of her prima facie case of retaliation. "Failure to satisfy any element of the prima facie case proves fatal to the employee's

14

retaliation claim."  *Roney*, 474 F.3d at 459.  As a result, ENT is entitled to summary judgment on Snyder's retaliation claim.

## D.  Hostile Work Environment Claim

In order to show that a hostile work environment resulted in her constructive discharge, Snyder must not only demonstrate that a hostile work environment existed at ENT, but also that the abusive work environment was so intolerable that her resignation was an appropriate response.  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 131-32 (2004), *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004) It is difficult for a plaintiff to establish constructive discharge.  "Absent extraordinary conditions, a complaining employee is expected to remain on the job while seeking redress [for Title VII violations]."  *Cooper-Schut v. Viaston Automotive Systems*, 361 F.3d 421, 429 (7th Cir. 2004).

An employee may assert a claim of constructive discharge "when she is forced to resign because her working conditions from the standpoint of a reasonable employee have become unbearable." *Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662, 667 (7th Cir. 2001), *cert. denied,* 534 U.S. 1041 (2001).  "Unbearable" means the working conditions must be more than merely unbearable in an unbearable or intolerable way, "they must be intolerable in a discriminatory way."  *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996).  The employee must be able to demonstrate that the discriminatory work environment was "even more egregious than the high standard for hostile work environment."  *EEOC v. University of Chicago Hospital*, 276 F.3d 326, 332 (7th Cir. 2002). Plaintiff must present evidence that she had no other option than to quit, and that a

plaintiff who voluntarily resigns, "must climb a very steep hill to make her constructive discharge case." *Weiland v. Dept. of Transportation, State of Indiana,* 98 F.Supp.2d 1010, 1025 (N.D. 2000)

A hostile environment constructive discharge claim requires more than merely establishing that the working conditions were unpleasant. "A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Suders,* 542 U.S. at 147. This heightened standard is necessary because a Title VII plaintiff is expected to remain on the job while she seeks redress from her employer for alleged harassment. *Robinson v. Sappington,* 351 F.3d 317 (7th Cir. 2003) ; *Cooper-Schut,* 361 F.3d at 428-29. Therefore, not only must the harassment be unbearable, the plaintiff must afford the defendant the opportunity to protect her from the harassment. *Cooper-Schut,* 361 F.3d at 429. The employee must show that "quitting was the only way the plaintiff could extricate herself from the intolerable conditions. *Gawley v. Indiana University,* 276 F.3d 301, 312 (7th Cir. 2001).

In cases where the Seventh Circuit has found a constructive discharge in a hostile work environment situation, the plaintiff was exposed to a grave threat of physical injury and/or death, something clearly not present here. For example, in *Brooms v. Regal Tube Co.,* 881 F.2d 412, 423-24 (7th Cir. 1989), the plaintiff established intolerable working conditions and a constructive discharge where there was a series of escalating sexual remarks which culminated with a co-worker showing the plaintiff a racist, pornographic picture, telling her she was hired to perform the acts depicted in the picture, and grabbing and threatening to kill her. In *Taylor v. Western & Southern Life*

16

*Insurance Co.,* 966 F.2d 1188, 1191 (7th Cir. 1992), the plaintiff's boss constantly made racial comments and held a gun to the employee's temple. The supervisor also took a picture and then circulated the picture at a company meeting stating "this is what a nigger looks like with a gun to his head."

No such egregious work conditions exist here. There is nothing in the record to suggest that, like the plaintiffs in *Brooms and Taylor,* Snyder was in grave peril at any time during her employment with ENT. Snyder cannot satisfy the heightened standard required of a plaintiff attempting to prove hostile environment constructive discharge.

No reasonable jury would find that Snyder's work environment became unbearable from the standpoint of a reasonable employee. After all, Snyder continued to work at The Hearing Center and The Balance Center despite her contention that she was subjected to harassing conduct. She made the decision to voluntarily resign from both The Hearing Center and The Balance Center. Neither of her letters of resignation contain any indication that she resigned due to adverse or hostile conditions in the workplace. Under the circumstances presented, a reasonable employee in Snyder's situation would not have felt compelled to resign. The working environment at ENT was not so egregious so that a reasonable person would have felt compelled to quit. Thus, ENT is entitled to summary judgment on Snyder's constructive discharge claim.

### E. State law defamation claim

Whether a particular statement constitutes a statement of fact or an opinion is a matter of law to be resolved by the Court. *Jamerson v. Anderson Newspapers, Inc.,* 469 N.E.2d 1243, 1252 (Ind.Ct.App. 1984). The legal test for determining whether a

statement is a protected opinion depends upon whether the statement implies objectively verifiable or testable facts. *Filippo v. Lee Publications, Inc.*, 485 F.Supp.2d 969, 975 (N.D.Ind. 2007).

Courts have held that making a statement that an employee is unstable is a statement of opinion and not a statement of verifiable fact. In *Haywood v. Lucent Technologies, Inc.*, 169 F.Supp.2d 890 (N.D.Ill. 2001), a terminated employee alleged that her supervisors notified other staff and employees that she was unstable. The *Haywood* Court held that in a statement that Haywood was unstable was a pure opinion upon which Haywood could not base a defamation claim. 169 F.Supp.2d at 915. The Court held that an assertion that an individual was unstable was not objectively verifiable and therefore not actionable as defamation. *Id.* at 916.

Likewise, in *Lifton v. Board of Education of the City of Chicago,* 416 F.3d 571 (7th Cir. 2005), a former kindergarten teacher alleged that a school principal stated that she was "lazy," "burnt out," "resting on her laurels," "unstable," and "looking for sympathy." The District Court determined that the statements were statements of opinion and therefore not actionable as defamation. The Seventh Circuit Court of Appeals affirmed, holding that the alleged defamatory statement was merely an opinion which did not contain objectively verifiable facts and was therefore not actionable as defamation. 416 F.3d at 579. *See also, Lopos v. City of Meriden Board of Education,* 2006 WL 1438612, *8 (D.Conn. 2006) (statements allegedly made by a principal that the plaintiff was mentally and psychologically unstable and/or crazy and paranoid were statements of opinion which did not rise to the level of defamation because they were not based upon objective

18

facts); *Byrnes v. Lockheed-Martin, Inc.,* 2005 WL 3555701, *7 (N.D.Cal. 2005) (reference to an employee as being an unstable person is couched in the individual's perception and is therefore an opinion and not actionable as defamation); *Rizvi v. St. Elizabeth Hospital Medical Center,* 765 N.E.2d 395, 400 (Ohio.Ct.App. 2001) (referring to a fellow doctor as "crazy" was an opinion and not a defamatory statement. "People frequently used adjectives such as 'stupid' or 'crazy' to express their feelings or opinions about an individual" and such opinions are not actionable as defamation.).

Here, even if Livingston made the statement attributable to her, that Snyder was emotionally unstable, such statement is an expression of opinion and not a defamatory statement. Under all of the authorities cited herein, Livingston is therefore entitled to summary judgment on Snyder's state law defamation claim.

### IV.  CONCLUSION

For all of the foregoing reasons, defendants, by counsel, respectfully request that judgment be entered in their favor and against the plaintiff, Hope Snyder, with respect to all of the claims raised in her Complaint, and for all other just and proper relief in the premises.

                Respectfully submitted,

                CARSON BOXBERGER LLP


                By  s/Robert T. Keen, Jr.
                     Robert T. Keen, Jr./#5475-02


                By  s/Diana C. Bauer
                     Diana C. Bauer/#11906-64
                Attorneys for Defendants

1400 One Summit Square
Fort Wayne, IN 46802
Telephone: (260) 423-9411
F:\E\ENT 8091\Snyder, Hope -Complaint 15\Pleadings\Memo.MotionSJ.docx

## **CERTIFICATE OF SERVICE**

    I hereby certify that on this 4th day of November, 2011, a true and complete copy of the above and foregoing was electronically filed and/or mailed to:

    Christopher C. Myers
    Ilene M. Smith
    Christopher C. Myers & Associates
    809 S. Calhoun Street, Suite 400
    Fort Wayne, IN 46802

                     s/Diana C. Bauer