**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| HOPE L. SNYDER,<br><br>Plaintiff,<br><br>v.<br><br>D. ANNE LIVINGSTON and EAR, NOSE & THROAT ASSOCIATES, PC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CAUSE NO. 1:11-CV-77 |

**OPINION AND ORDER**

## I. INTRODUCTION

Plaintiff Hope Snyder was employed by Defendant Ear, Nose & Throat Associates, PC ("ENT") in its Hearing Center and Balance Center from February 2006 until June 10, 2011. While at the Hearing Center, Snyder worked with Defendant D. Anne Livingston. In March 2010, Snyder and Livingston had a telephone conversation in which Snyder claims that Livingston called her "unstable." Snyder contends that Livingston repeated this comment to several people at ENT, resulting in what she believes was a demotion, her transfer from the Hearing Center to the Balance Center, and ultimately her resignation from the Balance Center. On the other hand, Defendants argue that any perceived "demotion" was simply a restructuring of responsibilities and that Snyder's decisions to transfer and resign were voluntary.

Subsequently, Snyder brought suit against Livingston and ENT, arguing that Livingston was liable for defamation under Indiana law (Am. Compl. ¶ 2) and that ENT had regarded her as disabled, discriminated and retaliated against her, and created a hostile work environment, all in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.* (Am.

Compl. ¶ 10).[1] Defendants moved for summary judgment on all of Snyder's claims. (Docket # 18.) As the motion is now ripe for ruling, Defendants' Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART for the reasons set forth below.

## II. THE MOTION TO STRIKE

Defendants also moved to strike portions of Snyder's affidavit, which was attached to her response, as contradicting her deposition testimony or constituting inadmissible hearsay. For the following reasons, Defendants' Motion to Strike Certain Portions of the Affidavit of Hope L. Snyder (Docket # 45) will be GRANTED IN PART and DENIED IN PART.

### *A. Applicable Law*

Federal Rule of Civil Procedure 56 states that affidavits filed in support of summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). "An affidavit not in compliance with Rule 56 can neither lend support to, nor defeat, a summary judgment motion." *Paniaguas v. Aldon Cos.*, No. 2:04-CV-468-PRC, 2006 WL 2568210, at *4 (N.D. Ind. Sept. 5, 2006) (citing *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1148-49 (7th Cir. 1989); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)).

"[W]hen considering a motion to strike portions of an affidavit in support of a motion for summary judgment, courts will only strike and disregard the improper portions of the affidavit and allow all appropriate recitations of fact to stand." *Id.*; *see also Stromsen v. Alumna Shield*

---

[1] Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (*See* Docket # 12.)

*Indus., Inc.*, No. 89 C 5036, 1993 WL 34727, at *4 (N.D. Ill. Feb. 8, 1993); *Toro Co. v. Krouse, Kern & Co.*, 644 F. Supp. 986, 989 (N.D. Ind. 1986); CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2738 (3d ed. 2006). Specifically, the following statements are not properly included in an affidavit and should be disregarded: (1) conclusory allegations lacking supporting evidence, *see Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 812 (7th Cir. 2011); (2) legal argument, *see Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985); (3) self-serving statements without factual support in the record, *Broaddus v. Shields*, 665 F.3d 846, 856 (7th Cir. 2011); (4) inferences or opinions not "grounded in observation or other first-hand experience," *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991); (5) mere speculation or conjecture, *see Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); and (6) statements or conclusions that contradict prior deposition or other sworn testimony, without explaining the contradiction or attempting to resolve the disparity, *see LaFary v. Rogers Grp., Inc.*, 591 F.3d 903, 908 (7th Cir. 2010); *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996).

*B. Analysis*

Here, Defendants seek to strike paragraphs 4, 8, and 9 of Snyder's affidavit as contradicting her deposition testimony and paragraphs 7, 10, 11, and 14 as constituting inadmissible hearsay. The Court will address each category of objections in turn.

*1. Contradiction Objections*

Regarding the allegedly contradictory paragraphs, "[a] plaintiff cannot defeat a motion for summary judgment by 'contradict[ing] deposition testimony with later-filed contradictory affidavits.'" *LaFary*, 591 F.3d at 908 (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir.

2005)). Therefore, "[w]hen a conflict arises between a plaintiff's sworn testimony and a later affidavit or declaration, the 'affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken . . . .'" *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006) (quoting *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532-33 (7th Cir. 1999)). In the instant case, Defendants contend that paragraphs 4, 8, and 9 contradict Snyder's deposition testimony and, therefore, should be stricken from her affidavit.

*a. Paragraphs 4 and 9*: Paragraphs 4 and 9, in which Snyder states that she was demoted from Director of Administration to Office Manager, do not directly contradict her deposition testimony. In her deposition, Snyder characterizes her change in job duties as a "demotion" several times. (*See* Snyder Dep. 16, 23-24, 130.) Accordingly, the statements in paragraphs 4 and 9 characterizing her change in job duties as a demotion are consistent with her deposition, and Defendants' motion to strike is therefore DENIED as to paragraphs 4 and 9.

*b. Paragraph 8*: On the other hand, in paragraph 8 of her affidavit, Snyder states that "around [the] end of March or first of April," she was called into a meeting with Dr. Rao, CEO Steve Sandquist, and Dr. Kaiser and told that many of her duties were being taken away and "[she] was being demoted." Defendants contend that this contradicts Snyder's deposition testimony that no one used the word "demotion" in talking to her about the change in her job duties. (Snyder Dep. 130-31.) In response, Snyder claims that her deposition testimony was referring to a conversation in May 2010, while her affidavit references a conversation in late March or early April. Thus, according to Snyder, these statements are not contradictory.

But Snyder was asked in her deposition, "Did anyone *ever use* the word demotion in talking with you about the change in your job duties had occurred [sic]?" (Snyder Dep. 130-31

(emphasis added).) Snyder responded, "Not the word demotion, no." (Snyder Dep. 131.) Therefore, Snyder's statement in paragraph 8 of her affidavit that she was told she was being demoted contradicts her deposition testimony that no one *ever used* the word demotion in talking to her about her change in job duties. Therefore, Snyder's statement in paragraph 8 that she was told she was demoted should be stricken as contradictory, and Defendants' motion to strike is hereby GRANTED with respect to this statement. The rest of paragraph 8 will be permitted to stand. *Paniaguas*, 2006 WL 2568210, at *4.

*2. Hearsay Objections*

It is well settled that "[a] party may not rely on inadmissible hearsay to avoid summary judgment." *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) (citation omitted). As such, Defendants seek to strike paragraphs 7, 10, 11, and 14 as constituting inadmissible hearsay.

*a. Paragraph 7*: In paragraph 7, Snyder states that Dr. Michael Disher told her that Livingston had told Dr. Rao she was "emotionally unstable." While Defendants argue that this is inadmissible hearsay, Snyder contends that it constitutes an admission by a party opponent and, thus, non-hearsay. Ultimately, whether this is hearsay is inconsequential because Snyder also testified in her deposition as to this statement (*see* Snyder Dep. 21), and Defendants do not move to strike this portion of Snyder's deposition. Therefore, even if paragraph 7 were stricken, its substance would still come in via Snyder's deposition testimony, which has not been challenged. Accordingly, the Defendants' motion to strike paragraph 7 is MOOT.

*b. Paragraph 10*: Paragraph 10, in which Snyder claims that several managers told her that Livingston had been spreading the word at work that she was unstable within a day

or two of March 16, 2010, is not material to the summary judgment inquiry; therefore, the Court declines to address this portion of the motion to strike.

*c. Paragraph 11*: Defendants challenge Snyder's statements in paragraph 11 that Tom Boisimer had told her that others were making comments about her being unstable. These statements are relevant to Snyder's hostile work environment claim. Nonetheless, even considering them, Defendants will be entitled to summary judgment on that claim. As such, the Defendants' motion to strike paragraph 11 is MOOT as well.

*d. Paragraph 14*: Defendants also object to Snyder's claim in paragraph 14 that "[a]fter the transfer Livingston continued telling people that [she] was unstable." Snyder fails to lay any foundation for this statement or identify the "people" Livingston allegedly told of her instability. As such conclusory allegations lacking supporting evidence should be disregarded, *Abuelyaman*, 667 F.3d at 812, Defendants' motion to strike is GRANTED as to this statement in paragraph 14. The remainder of the paragraph will stand. *Paniaguas*, 2006 WL 2568210, at *4.

## III. PROCEDURAL BACKGROUND

In her Amended Complaint, Snyder brought a state law defamation claim against Livingston and the following claims against ENT: (1) a "regarded as disabled" claim; (2) a hostile work environment claim; and (3) a retaliation claim, all under the ADA; and (4) possibly, a constructive discharge claim. (*See* Am. Compl. ¶¶ 2, 9-10.) Defendants filed a Motion for Summary Judgment attacking each of these claims. (Docket # 18.) Snyder's response, however, explicitly abandons her state law defamation claim against Livingston and her retaliation claim against ENT and does not advance a constructive discharge claim. (*See* Pl.'s Resp. Br. in Opp. to Mot. for Summ. J. ("Pl.'s Resp.") 2.) Any issues raised in the summary judgment motion that

the non-moving party does not respond to are deemed abandoned. *See* FED. R. CIV. P. 56(e)(2); *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (collecting cases). Therefore, Defendants' Motion for Summary Judgment will be GRANTED as to Snyder's defamation and retaliation claims as well as any constructive discharge claim she may have brought.

Furthermore, as the Amended Complaint brings only a state law defamation claim against Livingston (*see* Am. Compl. ¶ 2) and Snyder has explicitly abandoned that claim (*see* Pl.'s Resp. 2), Livingston is entitled to summary judgment in her favor and dismissal from this case.[2] As such, Defendants' Motion for Summary Judgment will be GRANTED as to Livingston.

## IV. FACTUAL BACKGROUND[3]

Snyder began working at ENT as a Hearing Aid Dispenser in the Hearing Center on February 1, 2006. (Snyder Dep. 27; Sandquist Aff. ¶ 3.) In May 2008, Snyder became Office Manager, a position she held until September 2009 when she assumed the role of Director of Administration. (Snyder Dep. 16, 27.) Snyder was the Director of Administration at the Hearing Center until April 2010. (Snyder Dep. 27-28.)

Livingston started her employment with ENT on November 19, 2007, as a staff audiologist (Livingston Aff. ¶ 2); by March 2010, she was the Director of Dispensing Audiology (Snyder Dep. 17). From February 2008 to March 2010, Snyder considered Livingston a friend, and the two socialized outside of work. (Snyder Dep. 28; Snyder Aff. ¶ 5.) Snyder openly

[2] Even if Snyder's Amended Complaint can be construed to bring ADA claims against Livingston, Livingston would still be entitled to summary judgment as a matter of law because the ADA provides for only employer, not individual, liability. *Silk v. City of Chicago*, 194 F.3d 788, 797 n.5 (7th Cir. 1999); *see, e.g.*, *Cordova v. Univ. of Notre Dame Du Lac*, No. 3:11-CV-210 RM, 2011 WL 6257290, at *2 (N.D. Ind. Dec. 13, 2011); *Boyd-Radford v. Padilla*, No. 2:10-CV-369-TLS, 2011 WL 710452, at *1 (N.D. Ind. Feb. 22, 2011).

[3] For summary judgment purposes, the facts are recited in the light most favorable to Snyder, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

discussed her attention deficit disorder ("ADD") with Livingston and other co-workers. (Livingston Aff. ¶ 3.) During the summer of 2008, Snyder also told Livingston about her psychological disorders and treatment. (Snyder Aff. ¶ 5.) At some point, they talked about Snyder taking anti-depressants and, possibly, her postpartum depression. (Snyder Dep. 121-22.)

On March 12, 2010, Snyder spoke to Livingston on the telephone and indicated that she wanted to transfer to another ENT office. (Snyder Aff. ¶ 6; Livingston Aff. ¶ 5.) Livingston recalls Snyder being in tears. (Livingston Aff. ¶ 5.) Livingston suggested that Snyder think about everything over the weekend, and then they would discuss the matter further the following week. (Livingston Aff. ¶ 5; Snyder Aff. ¶ 6.) On March 16, 2010, Snyder and Livingston had a second telephone conversation in which they argued with each other. (Livingston Aff. ¶ 6; Snyder Aff. ¶ 6; Snyder Dep. 15.) During this conversation, Snyder contends that Livingston called her "emotionally unstable"[4] and told her she "should get help." (Snyder Dep. 15; Snyder Aff. ¶ 6.) Livingston maintains that she stated only that Snyder "appeared to be on a bit of an emotional roller coaster and that no one knew how to act around her." (Livingston Aff. ¶ 6.)

The following day, Snyder testified that Dr. Disher told her that Dr. Rao, an ENT physician supervisor, had told him that Livingston had repeated her comment that Snyder was "unstable" to Dr. Rao on March 16th. (Snyder Dep. 21.) Livingston admits that she may have repeated her comment about Snyder being on an emotional roller coaster, but denies that she used the phrase "mentally unstable" with anyone about Snyder. (Livingston Aff. ¶ 7.)

According to Snyder, at the end of March or the beginning of April 2010, she had a

[4] At other times, Snyder contends that Livingston called her "unstable" or "mentally unstable," rather than emotionally unstable. (*See* Snyder Aff. ¶¶ 6, 10, 11.) The exact term allegedly used, however, is not particularly consequential.

meeting with Dr. Rao; Steve Sandquist, ENT's CEO; and a Dr. Kaiser, in which they changed her job duties and made her Office Manager. (Snyder Dep. 16-17; Snyder Aff. ¶ 9.) Snyder believes this was Dr. Rao's decision. (Snyder Dep. 24-25.) After this meeting, Snyder alleges Livingston became her supervisor, where as before they had been equals; her payroll responsibilities were taken away; she could no longer do the time keeping for the office staff, make day-to-day decisions without contacting Livingston, or maintain the schedule; she was responsible for only one office instead of multiple ones; and she lost her opportunity for director's bonuses. (Snyder Dep. 17, 23-24; Snyder Aff. ¶¶ 8, 13.) Snyder further maintains that a couple of weeks after this meeting, Livingston told her that some of her duties were being taken away to "take the burden off" of her. (Snyder Aff. ¶ 8.) At the same time, Snyder's pay, benefits, and work schedule did not change. (Snyder Dep. 24; Sandquist Aff. ¶ 6.) Snyder characterizes this as a demotion (*see* Snyder Dep. 16, 23-24, 130), but admits that no one used the word "demotion" in talking about her change in duties (Snyder Dep. 130-31). According to Snyder, Dr. Rao did not indicate why her duties were changed or mention her physical or mental state, but did refer to Livingston's characterization of her and the tension between them, noting they could not work together any longer or as equals. (Snyder Dep. 25.)

In Spring 2010, Dr. Disher was the physician responsible for the Hearing Center (and Snyder's immediate supervisor). (Sandquist Aff. ¶ 6; Snyder Dep. 16.) On May 10, 2010, ENT formally removed Dr. Disher from his responsibilities and restructured job responsibilities and duties of the Hearing Center's physicians and personnel. (Sandquist Aff. ¶ 6.) Sandquist maintains that, rather than Snyder being "demoted," there was simply a reorganization of job responsibilities and duties. (Sandquist Aff. ¶ 6.) He further contends that there was no change to

Snyder's job responsibilities or duties. (Sandquist Aff. ¶ 6.) Both Livingston and Sandquist aver that at no time did they perceive Snyder as being disabled or unable to perform any of her work-related duties because she had ADD or any other emotional or mental problems or because of Livingston's alleged comments. (Livingston Aff. ¶ 4; Sandquist Aff. ¶ 5.)

In April or May 2010, Snyder applied for a job as a Balance Technician at the Balance Center (Snyder Dep. 28; Snyder Aff. ¶ 11), another entity owned by ENT (Sandquist Aff. ¶ 2). She was offered this position some time in May. (*See* Snyder Dep. 28; Snyder Aff. ¶ 11.) Her new supervisor was Tom Boismier. (Snyder Aff. ¶ 4; Snyder Dep. 22.) According to Snyder, Boismier told her that upon hearing that he had hired Snyder, Director of Reception Carol Heffley expressed dismay that he was hiring "that mentally unstable girl." (Snyder Dep. 22.)

On May 28, 2010, Snyder resigned from her position with the Hearing Center. (*See* Snyder Dep. Ex. D.) Snyder began her new position at the Balance Center on June 14, 2010. (Sandquist Aff. ¶ 4.) She took a pay cut of $10,400 per year and lost the opportunity for bonuses and a $1,000 yearly continuing education allotment that she had previously received at the Hearing Center. (Snyder Aff. ¶ 13.) Snyder also maintains that, once she transferred to the Balance Center, she was not able to use her hearing aid license and had restrictions placed on her that other employees did not. (Snyder Aff. ¶¶ 9, 12, 14.)

On August 11, 2010, Snyder filed a Charge of Discrimination against ENT, contending that ENT perceived her as being mentally disabled. (Snyder Dep. 72-73; Snyder Aff. ¶ 15.) The basis for Snyder's claim is Livingston's alleged comment that she was "emotionally unstable." (Snyder Dep. 73.) In her deposition, Snyder testified that she did not believe she was disabled under the ADA and explicitly limited her claim to a perceived mental disability. (Snyder Dep.

72-73.) Snyder filed a Second Charge of Discrimination on November 18, 2010, alleging disability discrimination, harassment, and retaliation. (Snyder Aff. ¶ 15.) On May 13, 2011, Snyder resigned from her position as Balance Technician, effective June 10, 2011, thus ending her employment relationship with ENT. (*See* Snyder Dep. Ex. E; Sandquist Aff. ¶ 4.)

## V. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## VI. DISCUSSION

After winnowing the case down, the Court will now address Snyder's remaining claims under the ADA: (1) disability discrimination and (2) a hostile work environment.

*A. ADA "Regarded As Disabled" Claim*[5]

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment." *Hoffman v. Carefirst of Fort Wayne, Inc.*, 737 F. Supp. 2d 976, 984 (N.D. Ind. 2010) (quoting 42 U.S.C. § 12112(a)). To prevail on an ADA discrimination claim, the plaintiff bears the burden of showing that (1) she is disabled; (2) she is qualified to perform the essential function of the job with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability.[6] *Id.* (citing *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 442 (7th Cir. 2008)). An individual is considered disabled under the ADA if she has (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (2) "a record of such an impairment"; or (C) is "regarded as having such an

[5] When responding to Defendants' Motion for Summary Judgment, Snyder raises, for the first time, the claim that she had an *actual* impairment, namely ADD. (*See* Pl.'s Resp.7-8.) Defendants interpret this as Snyder's attempt to pursue a new, actual disability claim. (*See* Defs.' Reply 2-4.) It is well settled, however, that "[a] claim raised for the first time in response to a motion for summary judgment is not properly before the court." *Chinn v. Cantrell*, No. 2:04-cv-393, 2006 WL 2927595, at *4 (N.D. Ind. Oct. 11, 2006); *see Aida Food & Liquor, Inc. v. City of Chicago*, 439 F.3d 397, 402 (7th Cir. 2006) ("[A] response to summary judgment is hardly a timely filing in which to raise an issue."); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). Moreover, Snyder's own deposition testimony explicitly limited her claim to that of a perceived disability. (*See* Snyder Dep. 72-73.) Additionally, Snyder stated that the basis of her perceived disability claim was Livingston's alleged comment that Snyder was "emotionally unstable"; no mention was made of Snyder's ADD. (Snyder Dep. 73.) The summary judgment stage is too late for Snyder to add any claim of actual disability. *See, e.g.*, *Aida Food & Liquor, Inc.*, 439 F.3d at 402; *Shanahan*, 82 F.3d at 781; *Chinn*, 2006 WL 2927595, at *4. To the extent that Snyder argues that ADD is her actual impairment that caused ENT to regard her as disabled, this claim will be addressed below.

[6] The ADA Amendments of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008), effective January 1, 2009, apply to this case. While the elements cited here are derived from pre-amendment law, in *Hoffman*, 737 F. Supp. 2d at 984, a case applying the ADAAA, the court relied on pre-amendment case law to set forth the elements of a *prima facie* case of ADA discrimination, which is consistent with what other district courts have done, *see Becker v. Elmwood Local Sch. Dist.*, No. 3:10 CV 2487, 2012 WL 13569, at *9 (N.D. Ohio Jan 4. 2012) (citing 6th Circuit cases relying on pre-amendment law for the *prima facie* elements of an ADA discrimination claim); *Fleck v. Wilmac Corp.*, No. 10-05562, 2011 WL 1899198, at *4 (E.D. Pa. May 19, 2011) (citing Third Circuit cases from 1998 and 1996 for its recitation of the *prima facie* elements of an ADA discrimination claim). Therefore, it appears as if the *prima facie* elements of an ADA discrimination claim remain the same under the ADAAA.

impairment." 42 U.S.C. § 12102(1). As amended, "an individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3).

The first two requirements of the *prima facie* case are merely restatements of the statutory elements. *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006); *Walter v. Wal-Mart Stores Inc.*, No. 4:09-CV-15 JD, 2011 WL 4537931, at *9 (N.D. Ind. Sept. 28, 2011). Once a plaintiff bears the burden of showing these first two elements, she can satisfy the third part of the test—that she suffered an adverse employment action because of her disability—by proceeding under the direct or indirect method of proof. *Timmons*, 469 F.3d at 1127; *Walter*, 2011 WL 4537931, at *9; *see Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).

*1. A Factual Dispute Exists Concerning Whether Snyder Was"Regarded As Disabled"*

In their Motion for Summary Judgment, Defendants argue that, even if Livingston told others at ENT that Snyder was "mentally unstable," this statement is insufficient as a matter of law to establish that Livingston, or anyone else at ENT, regarded Snyder as disabled. (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem. of Law") 8.) But Defendants rely on a number of cases applying pre-amendment ADA law to support this proposition, which is problematic. (*See* Defs.' Mem. of Law 8-11 (citing, among others, a 2004 District of Arizona case, a 2003 Seventh Circuit case, and a 2001 Eighth Circuit case).)

Prior to the ADAAA, a plaintiff proceeding under the "regarded as" prong had to show

that the employer mistakenly believed either that she had an impairment that substantially limited a major life activity or that her actual, but non-limiting, impairment substantially limited a major life activity. *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 556 (7th Cir. 2011) (citations omitted). Congress amended the ADA, however, "to make it easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4); *see* ADAAA, Pub. L. No. 110-325 (stating that one of the purposes of the ADAAA is "reinstating a broad scope of protection to be available under the ADA"); *Hoffman*, 737 F. Supp. 2d at 984. According to the regulations, the definition of "disability" is to be construed broadly in favor of expansive coverage, and the primary focus in ADA cases "should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." 20 C.F.R. § 1630.1(c)(4). Consistent with this purpose, "while the ADA previously required the perceived disability to substantially limit a major life activity, the [ADAAA] removed this hurdle," and the "ADA now includes perceived disabilities 'whether or not the impairment limits or is perceived to limit a major life activity.'" *Becker*, 2012 WL 13569, at *9 (quoting 42 U.S.C. § 12102(3)(A)). Accordingly, as the ADAAA changed the interpretation of the disability categories and broadened the ADA's scope, *Hoffman*, 737 F. Supp. 2d at 984, relying on cases applying the pre-amendment version of the ADA is unpersuasive, *see Becker*, 2012 WL 13569, at *10 (noting that, despite factual similarities between the present case and a prior one, the court was unpersuaded because the prior case relied on the pre-amendment version of the ADA).

Here, the Defendants rely on several cases for the proposition that calling someone "mentally unstable" is insufficient as a matter of law to establish a "regarded as disabled" claim.

(*See* Defs.' Mem. of Law 8-11.) All these cases, however, apply the pre-amendment ADA, which required the plaintiff show that an actual or perceived impairment was regarded as substantially limiting a major life activity, *Serednyj*, 656 F.3d at 556. (*See* Defs.' Mem. of Law 8-9 (citing *Roberts v. Dimension Aviation*, 319 F. Supp. 2d 985, 990 (D. Ariz. 2004) (holding that insults such as "Del, short for deliverance," "stupid," "retarded," and "fag" are insufficient to establish that the plaintiff was regarded as disabled, which the court explicitly stated required that the perceived impairment be "substantially limiting and significant")), 9-10 (citing *Tockes v. Air-Land Transp. Servs., Inc.*, 343 F.3d 895, 896 (7th Cir. 2003) (holding that calling the plaintiff "crippled," "disabled," and "handicapped" was insufficient to establish ADA protection when "there is no evidence that his employer harbored the erroneous belief that he was disabled *within the meaning of the Act*," which would have been the more restrictive, pre-amendment meaning of "regarded as disabled") (emphasis in original)), 10 (citing *Costello v. Mitchell Public Sch. Dist. 79*, 266 F.3d 916, 924 (8th Cir. 2001) (applying the pre-amendment ADA to hold that, with evidence showing that defendants treated plaintiff as if she was a student *without* a substantially limiting impairment, mere name-calling was insufficient to raise a genuine issue of material fact on the plaintiff's perceived disability claim)).)

Ultimately, Defendants' reliance on case law applying the pre-amendment ADA fails to show that calling Snyder mentally unstable is insufficient as a matter of law to establish that Snyder was *not* regarded as disabled under the amended, more expansive version of the ADA. Furthermore, according to the new regulations, this Court is not supposed to engage in an extensive analysis of whether Snyder is disabled under the ADA, but rather focus on whether ENT has complied with its obligations and whether discrimination has occurred. 20 C.F.R. §

1630.1(c)(4). Here, despite statements in affidavits from Livingston and Sandquist that they did not perceive Snyder as disabled, there is sufficient evidence to create a factual dispute as to whether Livingston or others at ENT regarded Snyder as disabled, including what Livingston's comment actually was—that Snyder was either unstable or on a "bit of an emotional rollercoaster"—and whether Livingston then repeated the "unstable" comment, as Snyder alleges, or merely the "emotional roller coaster" comment, as Livingston admits (Livingston Aff. ¶ 7), to others at ENT. Therefore, Snyder has presented enough evidence from which a reasonable jury could conclude that ENT regarded her as disabled.

Finally, Snyder also argues that she had an actual impairment—ADD. While ADD may constitute a mental impairment within the meaning of the ADA, *see Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998); *Stutler v. Cellco P'ship*, No. 3:10-cv-352, 2012 WL 425770, at *3 (N.D. Ind. Feb. 9, 2012), Snyder explicitly testified at her deposition that her perceived disability was a mental disability and, when asked if her perceived disability was "anything more specific than that," replied in the negative. (Snyder Dep. 72-73.) She did not mention her ADD—a recognized mental impairment under the ADA—or any other specific mental impairment in response to such direct questioning. Instead, she expressly stated that she was *not* perceived as having anything more specific than a "mental disability." Even if Snyder had not so limited her claim in her deposition, there is sufficient evidence that Livingston and others at ENT knew about Snyder's ADD well before her alleged demotion (*see* Livingston Aff. ¶ 3; Snyder Aff. ¶ 5), and Snyder presents no evidence causally linking any adverse employment action with her ADD. As such, Snyder's ADD argument is a non-starter.

*2. No One Appears to Dispute that Snyder Was a Qualified Individual*

After establishing disability, Snyder must demonstrate that she is a "qualified individual" under the ADA. *Walter*, 2011 WL 4537931, at *10 (citations omitted). "An individual is considered 'qualified' if [she] can perform the essential functions of the employment position that [she] holds or desires, with or without reasonable accommodation." *Id.* (citations omitted); *see* 42 U.S.C. § 12111(8). ENT does not appear to contest that Snyder was qualified to perform the essential functions of her employment position. The only explanation they offer for her change in duties was a restructuring of responsibilities and duties. (Sandquist Aff. ¶ 6.) There are no allegations that Snyder's duties were changed because she was not qualified or otherwise unable to do her job. Furthermore, Defendants do not contend that Snyder was effectively forced to transfer or resign because of poor performance; rather, they argue that Snyder voluntarily decided to transfer, and ultimately to resign from, the Balance Center. Snyder further maintains that no one ever told her she was having a performance problem (Snyder Aff. ¶ 8), which Defendants do not dispute. As such, as it does not appear to be contested, Snyder has borne her burden of establishing she was a "qualified individual" under the ADA.

*3. There Are Genuine Issues of Material Fact Regarding Whether Snyder Suffered an Adverse Employment Action Because of Her Disability*

Once Snyder has established that she is protected by the ADA, she can prove disability discrimination by using the direct or indirect method of proof. *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). Snyder proceeds under only the direct method. (*See* Pl.'s Resp. 8-11.)

*a. Adverse Employment Action*

Even proceeding under the direct method, Snyder must demonstrate that she suffered an

adverse employment action. *Dass v. Chicago Bd. of Educ.*, __F.3d __, 2012 WL 1228188, at *7 (7th Cir. Apr. 12, 2012). As such, Snyder argues that an adverse employment action occurred when her duties were changed and her position was reduced from Director of Administration to Officer Manager, resulting in a loss of status and opportunity for advancement. (Pl.'s Resp. 9.) On the other hand, Defendants contend this is not an adverse employment action because Snyder's pay and benefits did not change. (Defs.' Reply 9-11.)

An adverse employment action is "more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002) (quoting *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996)). Nevertheless, "not everything that makes an employee unhappy is an actionable adverse action." *Dass*, 2012 WL 1228188, at *8 (quoting *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)). At a minimum, the plaintiff "must show quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

As the Seventh Circuit has articulated, adverse employment actions generally fall into three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as hostile work environment or conditions amounting to constructive discharge." *Barton v.*

*Zimmer, Inc.*, 662 F.3d 448, 454 (7th Cir. 2011) (citation omitted). These categories are not meant to cover cases of "purely subjective preference for one position over another." *Herrnreither v. Chicago Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002). As such, cases in the second category should be distinguished from cases involving a purely lateral transfer—a transfer that does not involve a demotion in form or substance. *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (citation omitted); *see also Hicks v. Sheahan*, No. 03 C 0327, 2004 WL 3119016, at *20 (N.D. Ill. Dec. 20, 2004) (finding that an employment action did not fall into the second category when the plaintiff failed to provide any evidence that the transfer reduced his career prospects or that his responsibilities were less significant than those of his prior position).

Nonetheless, while "mere lateral transfers, even if accompanied by bruised egos and petty slights, are not adverse employment actions," despite these general categories, courts have found that "under certain circumstances, a plaintiff's transfer can be considered an adverse employment action even if his salary and benefits remain steady." *Williams v. Lovchik*, __ F. Supp. 2d __, 2011 WL 5593669, at *14 (S.D. Ind. Nov. 17, 2011); *see also Tart v. Ill. Power Co.*, 366 F.3d 461, 473-74 (7th Cir. 2004) (finding it reasonable for a jury to conclude that the plaintiffs' reassignment was an adverse employment action because it placed them in positions that were objectively inferior and involved far less skill and independence and significantly harsher working conditions than their previous ones, even though their pay, title, and benefits were unchanged). For example, "an adverse employment action can occur where an employee's new position is considered less important within the organization, where it requires less skill or brainpower, or where it results in significant reduction in responsibilities." *Williams*, 2011 WL

5593669, at *14; *see, e.g.*, *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365 (7th Cir. 2009) (transfer to position that was considered less important in the office hierarchy could be deemed an adverse employment action despite no reduction in pay or benefits); *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir. 1994) (changing plaintiff's duties from a mix of intellectually stimulating and routine job responsibilities to only routine duties is a "dramatic downward shift in skill level" that "can rise to the level of an adverse employment action").

As for reduced responsibilities, both the Seventh Circuit and district courts within the circuit have found adverse employment actions when the plaintiff's responsibilities are significantly diminished, despite no change in pay or benefits. *Timmons*, 469 F.3d at 1128 (finding that placing the plaintiff on disability leave was an adverse employment action when, although he still received the equivalent of his old salary through social security and disability payments, his material responsibilities were undoubtedly diminished); *Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir. 2001) (holding that a rational jury could find that the plaintiff's responsibilities were diminished to the extent that she suffered an adverse employment action when her responsibilities were decreased from preparing the budget and payroll and staffing hundreds of clerks to emptying lottery machines and scheduling only five clerks, even though her title and compensation remained the same); *Riddle v. Bed, Bath & Beyond*, No. 1:06-cv-289-JDT-TAB, 2007 WL 1597921, at *6 (S.D. Ind. May 31, 2007) (noting that transfers can still be adverse employment actions even if the pay remains the same or is greater so long as some material diminution of responsibilities or benefits can be demonstrated); *Davis v. Harris*, No. 03-3007, 2006 WL 3321630, at *22 (C.D. Ill. Nov. 14, 2006) (noting that a significant reduction in responsibilities can constitute an adverse employment action).

On the other hand, a title change in which the employee's responsibilities, salary, benefits, and opportunities for promotion stay the same does not qualify as an adverse employment action. *Maclin*, 520 F.3d at 789 (citation omitted). Similarly, a "title change and different reporting relationship [is] largely semantic 'where the employee's salary, benefits, and level of responsibility would remain unchanged.'" *Tart*, 366 F.3d at 747 (quoting *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir. 1994)).

Here, neither party attempts to place Snyder's changed responsibilities[7] and alleged demotion within or outside of the Seventh Circuit's three categories. The closest category appears to be the second—transfers or changes in job duties that significantly reduce the employee's career prospects. Admittedly, Snyder's change in duties does not fall directly into this category, but, viewing the facts in the light most favorable to Snyder, it does not fall outside the realm of actionable employment actions either. These categories are meant to exclude a "purely subjective preference for one position over another," *Herrneirther*, 315 F.3d at 745; yet, as explicated below, Snyder's change of duties and reduction in title is not merely a subjective preference. Moreover, cases in the second category are ones that do not involve a demotion in form or substance, *Maclin*, 520 F.3d at 788, but, in this case, a reasonable jury could find that Snyder suffered a demotion in substance, even though her pay and benefits remained the same, particularly since her responsibilities were significantly diminished, *see Hicks*, 2004 WL 3119016, at *20 (finding that an employment action did not fall into the second category when

[7] Although Sandquist avers that there was no change to Snyder's job responsibilities or duties (Sandquist ¶ 6), Defendants do not otherwise dispute that Snyder's duties and responsibilities were changed (*See* Defs.' Reply 10-11). Sandquist's statement that Snyder's duties and responsibilities were not changed could, in and of itself, create a genuine issue of material fact as to whether Snyder's duties were changed at all, thereby precluding summary judgment. Defendants, however, appear to concede that Snyder's duties were changed and argue that an alteration of job responsibilities does not qualify as an adverse employment action. (*See* Defs. Reply 10-11.)

the plaintiff failed to provide any evidence that the transfer reduced his career prospects *or that his responsibilities were less significant than those of his prior position*). Therefore, Snyder has presented sufficient evidence from which a reasonable jury could conclude that she suffered an adverse employment action.

First, Snyder alleges that she experienced a loss of status and an accompanying opportunity for advancement when her position was reduced from Director of Administration to Office Manager. (Pl.'s Resp. 9.) This new position was less prestigious and would be considered "less important" within ENT than her previous one, which suggests an adverse employment action occurred. *See Patterson*, 589 F.3d at 365; *Williams*, 2011 WL 5593669, at *14. At the same time, Snyder's title was not simply changed to a less prestigious one; her responsibilities and independence were significantly diminished as well, strengthening her argument that she suffered an adverse employment action. *See Williams*, 2011 WL 5593669, at *14; *cf. Maclin*, 520 F.3d at 789 (stating that a title change *without* any accompanying change in an employee's responsibilities, salary, benefits, and opportunities for promotion does not qualify as an adverse employment action). Reminiscent of the plaintiff in *Hoffman-Dombrowski*, 254 F.3d at 651, whose responsibilities were decreased from preparing the budget and payroll and staffing hundreds of clerks to emptying lottery machines and scheduling only five clerks, once her position was reduced from Director of Administration to Office Manager, Snyder went from being in charge of multiple offices to just one and had her payroll, time keeping, and scheduling responsibilities taken away. As the Seventh Circuit held in *Hoffman-Dombrowski*, a rational jury could find that Snyder's responsibilities were diminished to the extent that she suffered an adverse employment action. *Id.*; *see, e.g., Timmons,* 469 F.3d at 1128; *Riddle*, 2007 WL

1597921, at *6; *Davis*, 2006 WL 3321630, at *22.

Beyond having her title changed and responsibilities reduced, Snyder was also put under the supervision of Livingston, the person who had allegedly called her "unstable," whereas before they had been equals. While a title change and different reporting relationship is largely semantic where the employee's salary, benefits, and level of responsibility stay the same, *Tart*, 366 F.3d at 747, Snyder's level of responsibility did not stay the same; rather, many of her duties were taken away and she could no longer make daily decisions without Livingston's approval, making this change in reporting relationship and title more than mere semantics. Moreover, Snyder's lack of independence in making daily decisions, being in charge of only one office instead of multiple ones as before, and having her payroll, time keeping, and scheduling responsibilities taken away would arguably require Snyder to use less skill or brainpower, further suggesting that an adverse employment action occurred. *See Tart*, 366 F.3d, at 743-74; *Dahm*, 60 F.3d at 257; *Williams*, 2011 WL 5593669, at *14.

Snyder also states that she lost an opportunity for director's bonuses when her position was reduced. (Snyder Aff. ¶ 13.) But the loss of a bonus is not an adverse employment action unless the employee is automatically entitled to it. *See Maclin*, 520 F.3d at 788. Here, it is unclear whether the director's bonus was discretionary or automatic. Either way, Snyder is not claiming that she was actually denied a director's bonus, but merely that she *lost the opportunity* for director's bonuses when her position was reduced. Such a material loss of benefits adds an additional level of adversity to Snyder's reduced responsibilities and position that could lead to a finding that she suffered an adverse employment action. *See Traylor*, 295 F.3d at 788 (noting that "a materially adverse change might be indicated by . . . a material loss of benefits"); *see*

*also Dilettoso v. Potter*, No. CV 04-0566-PHX-NVW, 2006 WL 197146, at *8 (D. Ariz. Jan. 25, 2006) (holding that the plaintiff suffered an adverse employment action when he was placed on administrative leave for nine months, during which he missed an opportunity to earn a $1,000 bonus); *cf. Bell v. Gonzales*, 398 F. Supp. 2d 78, 96-97 (D.D.C. 2005) (finding a lateral transfer resulting in the lost opportunity to earn overtime pay may constitute an adverse employment action). Arguably, the terms, conditions, and privileges of Snyder's employment were affected by her reduced title, such that she suffered an adverse employment action, because it resulted in the loss of the opportunity to receive future director's bonuses. *See Bush v. Am. Honda Motor Co., Inc.*, 227 F. Supp. 2d 780, 790 n.8 (S.D. Ohio 2002) (noting that the terms, conditions, and privileges of the plaintiff's employment were *not* affected by her demotion, such that she could show an adverse employment action, when her demotion did not result in the loss of any income or other benefits, *including the opportunity to receive future bonuses* or promotions).

Thus, viewing the facts in the light most favorable to Snyder, although her pay, benefits, and work schedule remained the same, Snyder's significant reduction in duties, supervisory responsibilities, and independence; placement in a less prestigious position, where she was under Livingston's supervision; and loss of opportunity for director's bonuses are sufficient to raise a factual issue as to whether Snyder suffered an adverse employment action. *See, e.g.*, *Traylor*, 295 F.3d at 788 (noting that an adverse employment action includes a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities). Furthermore, in a case such as this, where there is a genuine issue of material fact as to the degree of adversity Snyder suffered and whether it rises to the level of an adverse employment action, the question is appropriately left to the jury. *See*

*Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 436 (7th Cir. 2009) (noting that when the degree of adversity is substantially in doubt, the jury is appropriately presented with the issue).

*b. Direct Method*

Having demonstrated that a genuine issue of material fact exists as to whether an adverse employment action occurred, Snyder proceeds under the direct method to prove that ENT discriminated against her because of her perceived disability. *See Timmons*, 469 F.3d at 1127. Under the direct method, a plaintiff must offer either direct evidence that would prove the discriminatory intent without reliance on inference or presumption or "a convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker. *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 733-34 (7th Cir. 2011) (citations omitted). The Seventh Circuit has recently stated that this "mosaic" language "articulate[s] the principle that, for a plaintiff proceeding under the direct method to defeat summary judgment using circumstantial evidence, '[a]ll that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had [taken an adverse employment action against] the plaintiff because the latter was a member of a protected class.'" *Dass*, 2012 WL 1228188, at *10 (quoting *Hanners v. Trent*, __ F.3d __, 2012 WL 899062, at *7 (7th Cir. Mar. 19, 2012)). This type of circumstantial evidence includes, among others, suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. *Id.* The circumstantial evidence presented "must point directly to a discriminatory reason for the employer's action" and be "directly related to the employment decision." *Id.* (internal quotations and citations omitted).

Snyder relies partly on suspicious timing. According to Snyder, her change of duties and purported demotion occurred at the end of March or beginning of April 2010 as a result of the March 16th conversation in which Livingston allegedly called her unstable. (Snyder Dep. 16-17; Snyder Aff. ¶ 9.) Another part of her deposition, however, suggests that she was demoted on May 12, 2010. (Snyder Dep. 130.) When Snyder's duties changed is highly significant, especially regarding Snyder's suspicious timing argument, as ENT's stated reason for changing Snyder's job responsibilities was the restructuring of the Hearing Center as a result of Dr. Disher's formal removal as the physician responsible for the Hearing Center on May 10, 2010. (Sandquist Aff. ¶ 6.) If the change of duties occurred at the end of March or beginning of April, instead of May 12th, then ENT's stated reason for changing Snyder's duties becomes highly suspect because Snyder's responsibilities would have been changed over a month before Dr. Disher's formal removal. Moreover, if Snyder's responsibilities changed in late March or early April, this is potentially a little over two weeks after Livingston purportedly labeled her unstable.

While, by itself, temporal proximity would not normally create an issue of material fact as to causation, it could suffice where the adverse action followed on the heels of the employer's discovery of the employee's disability. *Buie*, 366 F.3d at 506-07; *see Gibson v. M & M Serv. Station Equip. Specialist, Inc.*, No. 1:06-cv-00861-SEB-DML, 2009 WL 899660, at *7 (S.D. Ind. Mar. 30, 2009) (denying summary judgment on ADA claim when there was circumstantial evidence that three days separated the plaintiff telling employees of his need for surgery and the date he was terminated); *cf. King v. Preferred Technical Grp.*, 166 F.3d 887, 893 (7th Cir. 1999) (reasoning that temporal proximity created an issue of fact where the plaintiff's termination occurred one day after she finished her FMLA leave). Moreover, the Seventh Circuit has "found

that three to four months between [an allegedly discriminatory] remark and an employment action is not so long as to defeat the inference of a causal nexus." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 632 (7th Cir. 2009) (citing *Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir. 2000)).

Here, while a gap of a little over two weeks is outside the one- or three-day period courts have deemed sufficient to survive summary judgment, *see King*, 166 F.3d at 893; *Gibson*, 2009 WL 899660, at *7, it is well within the three to four months that the Seventh Circuit has found is not so long as to defeat the inference of a casual connection, *Darchak*, 580 F.3d at 632. Furthermore, Snyder's duties were changed potentially within fourteen days of Livingston's alleged comment despite her never having any performance problems or indicating she wanted a decreased workload (Snyder Aff. ¶ 8), adding more support to her suspicious timing argument. *Cf. Jenkins v. Cummins, Inc.*, No. 1:10-cv-313-TWP-DKL, 2012 WL 1028826, at *10 (S.D. Ind. Mar. 26, 2012) (finding suspicious timing for a retaliation claim when the plaintiff was fired less than six weeks after making a complaint and was told an investigation into his time records was being conducted within days of this complaint, particularly since nothing had ever been said to the plaintiff about his time and attendance before the complaint). Regardless, Snyder does not rely entirely on suspicious timing to avoid summary judgment. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (reasoning that the mere fact that one event preceded another does not prove the first caused the second and that "other circumstances must also be present which reasonably suggest that the two events are somehow related to one another").

Snyder also points to other evidence in the record in support of her circumstantial evidence argument. For example, Snyder alleges that, within a couple of weeks of the late

March or early April meeting, Livingston told her that her duties were being taken away to "take the burden off" of her. (Snyder Aff. ¶ 8.) Yet Snyder avers that she never asked to have her duties reduced and was never told she was having a performance problem. (Snyder Aff. ¶ 8.) Notably, the record is unclear as Snyder's affidavit seems to suggest that she had some responsibilities, including her payroll, time keeping, and scheduling duties, taken away by Dr. Rao at the end of March or beginning of April and then other, unidentified duties taken away by Livingston a couple of weeks later, after Livingston became Snyder's supervisor. (Snyder Aff. ¶ 8.) Whether Livingston, as Snyder's supervisor, decided to take some of Snyder's duties away is significant because a remark can raise an inference of discrimination if it was made by the decisionmaker, around the time of the decision, and in reference to the adverse employment action. *Dass*, 2012 WL 1228188, at *11 (citation omitted). If Livingston was the decisionmaker with regard to a second stripping of duties, her "take the burden off" comment to Snyder would have been around the time of this second decision and in reference to it. If Snyder never asked to have her duties reduced and was not having a performance problem, then Livingston's "take the burden off" comment could lead to an inference that Snyder's purported "burden" was not her workload or performance, but rather her mental and emotional state.

Even if Livingston was not responsible for a second stripping of duties, there is evidence that the decisionmaker for Snyder's change of duties in late March or early April, Dr. Rao, knew of Livingston's "unstable" comment, which is necessary for an inference of causation. *See LaFary*, 591 F.3d at 908 (stating that the plaintiff could not prove a critical element of her pregnancy discrimination claim when she did not introduce evidence that the defendant knew about her pregnancy before it decided to transfer her). For instance, Snyder testified that Dr.

Disher told her that Dr. Rao had told him that Livingston had repeated to Dr. Rao the "unstable" comment the day after the March 16th phone conversation. (Snyder Dep. 21.) Furthermore, according to Snyder, while Dr. Rao did not refer to Snyder's mental state during the meeting in which her duties were altered, Dr. Rao did reference Livingston's characterization of Snyder in this meeting, allegedly saying that he did not like the tension between them and that Livingston and Snyder could no longer work together or as equals. (Snyder Dep. 25.) Yet, in this meeting, Dr. Rao purportedly decided that Snyder would be under Livingston rather than vice versa. Considering the timing of the decision—potentially just two weeks after Livingston's alleged comment—a reasonable jury could infer that Snyder was subordinated to Livingston (rather than the opposite) and effectively demoted because of a perceived disability—her mental or emotional instability. *See Dass*, 2012 WL 1228188, at *10.

Accordingly, having submitted sufficient evidence to raise a number of genuine factual issues, Snyder's "regarded as disabled" claim under the ADA survives summary judgment; as such, the Defendant's Motion for Summary Judgment on this claim will be DENIED.

*B. Hostile Work Environment Claim Under the ADA*

As her remaining claim, Snyder argues that ENT subjected her to a hostile work environment in violation of the ADA. The Seventh Circuit, however, has not yet decided whether the ADA encompasses a cause of action for hostile work environment, but has assumed the existence of such claim where resolution of the issue has not been necessary and that the standards for proving such a claim would mirror those established for hostile work environment claims brought under Title VII. *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005); *Jenkins*, 2012 WL 1028826, at *6 n.6. Therefore, for Snyder's hostile work environment claim to survive

summary judgment, Snyder must show the following: (1) she was subjected to unwelcome harassment; (2) the harassment was based on her perceived disability; (3) the harassment was sufficiently severe or pervasive as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004); *Jenkins*, 2012 WL 1028826, at *7.

Snyder's allegations of a hostile work environment fail to rise to the level of "severe and pervasive," as required by the third prong, precluding her from surviving summary judgment on this claim. Under the third prong, Snyder must prove that her workplace was both subjectively and objectively hostile; "[a]n objectively hostile environment is one that a reasonable person would find hostile or abusive." *Mannie*, 394 F.3d at 982 (citation omitted). Accordingly, Snyder "must demonstrate that a rational trier of fact could find that [her] workplace is permeated with discriminatory conduct—intimidation, ridicule, insult—that is sufficiently severe or pervasive to alter the conditions of employment." *Silk*, 194 F.3d at 804. "In determining whether a plaintiff has met this standard, courts must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating[,] or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The Seventh Circuit has further held that the an actionable workplace is one that is "hellish." *Whitaker v. N. Ill. Univ.*, 424 F.3d 640, 645-646 (7th Cir. 2005).

Here, Snyder argues that Livingston's alleged "unstable" comment and the repetition of it "were of a quality that any reasonable person in Snyder's shoes would have been offended." (Pl.'s Resp. 13-14.) An objectively hostile work environment, however, is "one that a

reasonable person would find *hostile or abusive*," not merely offensive. *Mannie*, 394 F.3d at 982 (emphasis added). Moreover, a factor to consider is whether the conduct was "physically threatening or humiliating[,] or a *mere offensive utterance*," *Silk*, 194 F.3d at 804 (emphasis added). Snyder makes no allegations that any one physically threatened or humiliated her; she alleges only that the repetition of the unstable comment, combined with her demotion and stripping of her duties, caused her to experience a level of stress, anxiety, and sadness to such a degree that her psychiatric medication had to be increased. (Pl.'s Resp. 14.) Yet Snyder presents no evidence beyond her own self-serving affidavit that her psychiatric medication was increased because of the alleged repetition of the unstable comment. *See Teninty v. Geren*, 776 F. Supp. 2d 725, 740 (N.D. Ill. 2011) (noting that the plaintiff had not presented any evidence corroborating her own testimony regarding her allegations and perceptions of harassment in granting summary judgment on the hostile work environment claim).

Even assuming that Snyder's psychiatric medication was increased because of these comments, Snyder makes no attempt to show that the repetition of these subjectively offensive allegations were so severe or pervasive to alter the conditions of her employment or unreasonably interfere with her work performance. *See Luckie*, 389 F.3d at 713; *Silk*, 194 F.3d at 804; *Jenkins*, 2012 WL 1028826, at *7. While she alleges that these comments caused her to leave the Hearing Center for a lower paying job at the Balance Center, and ultimately resign from the Balance Center a year later, she presents no evidence contradicting the Defendants' assertion that these were voluntary decisions; she has also failed to respond to Defendants' argument regarding any constructive discharge claim she may have brought, thereby abandoning the claim. *See Palmer*, 327 F.3d at 597-98. Ultimately, even accepting Snyder's allegations as

true, a reasonable person would not find the repetition of Livingston's "unstable" comment to be hostile or abusive.

Snyder further alleges that she ended her employment relationship with ENT because even working at the Balance Center was "unhealthy" for her. (Snyder Aff. ¶ 16.) Title VII—and therefore, the ADA, which would borrow Title VII's standards—"does not guarantee a utopian workplace, or even a pleasant one." *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (citation omitted). While Snyder's allegations establish that she was unhappy working at ENT, such allegations fall far short of creating an actionable workplace, *Teninty*, 776 F. Supp. 2d at 740, which is a "hellish" one, *Whitaker*, 424 F.3d at 645-646. Accordingly, as Snyder's allegations, even if accepted as true, fall short of this high standard, Snyder cannot establish a *prima facie* case of a hostile work environment, and the Court will GRANT Defendants' Motion for Summary Judgment on Snyder's hostile work environment claim.

**VII. CONCLUSION**

For the foregoing reasons, the Court DENIES Defendants' Motion for Summary Judgment (Docket # 18) as to Snyder's ADA "regarded as disabled" claim and GRANTS Defendants' Motion as to Snyder's hostile work environment, retaliation, defamation, and constructive discharge claims. Summary judgment is GRANTED in favor of Defendant D. Anne Livingston on all claims.

SO ORDERED.

Entered this 27th day of April, 2012.

/s/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge